IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MATTHEW DOUGHTY,

           Plaintiff,           OPINION AND ORDER

v.

                                         19-cv-529-wmc

DR. THOMAS GROSSMAN,

           Defendant.

*Pro se* plaintiff Matthew Doughty contends that defendant Dr. Thomas Grossman mishandled his 2017, total hip replacement surgery in violation of the Eighth Amendment and Wisconsin negligence law. Specifically, after Dr. Grossman performed the surgery, Doughty claims he told Grossman that "something was wrong," but he insisted that Doughty was fine, only to later learn there was a difference in the lengths of his legs, which could not be corrected by surgery. Dr. Grossman now seeks summary judgment. (Dkt. #43.) Because Doughty has offered *no* evidence of record permitting a finding that Dr. Grossman failed to exercise medical judgment, the court will grant Dr. Grossman's motion on the merits of Doughty's Eighth Amendment claim, relinquish supplemental jurisdiction over his remaining state negligence claim, and direct entry of final judgment in favor of defendant.

UNDISPUTED FACTS[1]

Currently, Matthew Doughty is incarcerated at New Lisbon Correctional

---

[1] The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate. However, Doughty also submitted numerous, proposed findings of fact related to research conducted by his daughter as to leg length disparities following his hip replacement surgery, as well as Dr. Grossman's reputation.

Institution, but in 2014, he was incarcerated at Waupun Correctional Institution. At that time, Dr. Grossman was working as an orthopedic surgeon for Agnesian HealthCare, and had already performed several hundred surgeries on DOC inmates.

Dr. Grossman first examined Doughty for his left hip complaints in August of 2014. At that time, he ordered x-rays that showed severe osteoarthritis of the left hip. Accordingly, Dr. Grossman diagnosed him with early degenerative joint disease, and they discussed and agreed upon a conservative treatment with Doughty, including injections to address his pain.

Approximately five months later, on January 14, 2015, Dr. Grossman examined Doughty again for left hip concerns. Dr. Grossman again ordered x-rays, which showed degenerative changes with moderate to severe narrowing of the left hip joint. During the appointment Doughty also reported left shoulder pain, along with ongoing left hip pain, and Dr. Grossman diagnosed Doughty's shoulder with AC joint arthrosis, partial rotator cuff tear and degenerative joint disease. Dr. Grossman's diagnosis of Doughty's left hip was trochanteric bursitis. Dr. Grossman recommended elective arthroscopy for the Doughty's shoulder and an additional injection of DepoMedrol with lidocaine to relieve his left hip symptoms. That same day, Dr. Grossman performed the injection in Doughty's hip without incident.

---

(*See* dkt. #53, ¶¶ 42-48, 50-51, 75.) Defendant properly objects to this evidence as hearsay, and Doughty has not submitted evidence purporting to dispute Dr. Grossman's professional opinion that leg length discrepancy is a recognized potential result of hip replacement surgery performed within the proper standard of care. Therefore, the court has excluded these proposed findings of fact. Regardless, unless otherwise indicated, the following facts are material and undisputed.

A little over two years later, on April 5, 2017, Doughty met with Dr. Grossman again for left hip pain. Dr. Grossman noted that Doughty was walking with an antalgic gait and said that he was "at the end of his rope" due to the hip pain. (Grossman Decl., Ex. 9 (dkt. #45-9).) The x-rays from that visit showed additional, significant osteophytic changes that had progressed over the previous two years. In fact, Dr. Grossman diagnosed Doughty with end-stage osteoarthritic of the left hip, and again discussed with Doughty management of his condition. Although Dr. Grossman attests that they discussed an operation as an option, including the risk of a leg length differential,[2] Doughty disputes that Dr. Grossman brought up this risk. Still, there is no dispute that at this time, Doughty preferred an operative solution, and in particular, agreed to a left total hip arthroplasty. Doughty further attests: (1) his legs were equal in length and (2) he did not have a limp. Still, Doughty submits no evidence that his legs were measured at that point; nor did Dr. Grossman measure Doughty's legs before the operation, which took place on September 11, 2017.

Dr. Grossman explains that during a total hip arthroplasty, the surgeon must place and position the hip components so they are stable, and will not dislocate intra- or post-operatively. Dr. Grossman further attests that during the procedure, Doughty was held in a device that kept him lying on his side at a 90-degree angle in relation to the operating table. After Dr. Grossman placed the final implants in his left hip, but before closing the

---

[2] Dr. Grossman attests that to ensure the necessary stability in the hip components, the surgeon sometimes makes a "tradeoff" in favor of stability versus leg length because an unstable component will dislocate, causing pain and disability. That tradeoff is why a leg length differential is a known complication of this type of operation.

incision, Dr Grossman also attests to observing that the legs were as equal in length as possible.  (Grossman Decl. (dkt. #45) ¶ 41.)  He also later wrote in the surgical report that his legs were clinically equal.  (Ex. 11 (dkt. #45-11) 1.)  Moreover, a postoperative x-ray was taken that day, which did not show any problems.  In addition, over the next three days, Dr. Grossman examined Doughty and noted that his films showed good position and alignment of the hip, and that Doughty was doing well.  Doughty was discharged on September 14, and Dr. Grossman's discharge summary noted that the surgery had been uncomplicated and that Doughty had done well.

Still, Doughty represents that he started complaining about leg length discrepancy and his gait just a week after surgery.  At that point, Doughty also claims he received shoe inserts to address both his leg length discrepancy and his limp, yet by October 2, he could not walk up or down stairs.  However, when Dr. Grossman met with Doughty for his one-month follow-up on October 11, Dr. Grossman ordered an x-ray of Doughty's hip, which showed:  good position and alignment of the left hip, joint prosthetic parts with no dislocation; no acute fracture lines or fragment; no bone destruction; and stable, mild degenerative disease of the right hip.

What happened during the rest of the examination, however, is in dispute.  Dr. Grossman noted that Doughty reported things were going well, and he conducted a physical examination, which found that Doughty had a non-antalgic gait, meaning that Doughty was not limping to avoid pain.  Dr. Grossman also noted that he conducted a Trendelenburg test, which is a procedure for determining hip-joint dysfunction or muscle weakness.  The test that day was negative.  Accordingly, Dr. Grossman recommended that

4

Doughty continue with total hip rehabilitation protocols, which precluded flexion over 90 degrees or flexion in internal or external rotation, and to avoid bending more than 90 degrees at the waist. Again, Dr. Grossman did not note any leg length discrepancy, and none of the imaging showed such a discrepancy.

For his part, Doughty claims that Dr. Grossman conducted no real physical examination on October 11. Instead, Doughty maintains that their entire encounter that day was just 90 seconds, throughout which he remained seated and handcuffed, so Dr. Grossman could not check his gait or perform a Trendelenburg test. Doughty further attests that he reported having a limp and "wobbling like a penguin" when he walked, as well as his concern about a leg length discrepancy, to which Dr. Grossman assured him that the limp, wobbling and leg inequality should subside in six months. Regardless, Dr. Grossman did not examine Doughty again because he retired on December 31, 2017, three months after Doughty's left hip replacement surgery.

On October 27, 2017, Waupun's physical therapist examined Doughty, noting "his gait looks really good being this close to the left total hip replacement." (Ex. A (dkt. #46-1).) While there was no note about a leg length differential at that time either, Doughty represents that he was wearing a three-and-one-quarter inch shoe insert in his right shoe by then.

In early 2018. Doughty was transferred to New Lisbon, where he claims his limping continued, and he experienced pain that was unlike before his surgery. Accordingly, by March of 2018, Doughty asked to see a physical therapist about his leg length discrepancy. The first time Doughty's medical records included a comment of a leg length differential

5

was on June 18, 2018. At that point, Doughty's left leg had been measured as one-half inch longer than his right leg, and Doughty says at that point he had a five-and-one-quarter inch insert for his right shoe. The next day a bilateral hip x-ray was taken, which showed a normal and intact left hip arthroplasty but osteoarthritis in Doughty's right hip, with a notable narrowing of the joint space in the right hip due to degenerative changes. Doughty was also referred to orthopedics for a heel lift and shoe modification.

However, Dr. Grossman does not believe that the leg length discrepancy did not occur because of the hip surgery he performed; rather, he explains that a discrepancy can occur over time due to a joint contracture, or arthritic or degenerative changes, including the loss of joint space. Dr. Grossman also opines that a patient like Doughty can experience a leg length discrepancy because of degeneration or loss of joint space in the opposite knee or hip. As proof, Dr. Grossman notes that none of Doughty's radiology reports show anything other than a normal left total hip replacement. He also attests that Doughty's records showed degenerative conditions in his right hip and knee, which resulted in a loss of joint placement over time, thus, explaining the leg length disparity noted in June.

On October 1, 2018, Doughty underwent a hip x-ray ordered by Dr. Eric Nelson, a surgeon. That x-ray showed an intact left hip arthroplasty and right hip joint space narrowing. Dr. Nelson examined Doughty and determined that the prosthetic components from the left total hip replacement were in good position and showed no complications. Doughty says that Dr. Nelson commented that he had a one-inch leg length disparity, but imaging from that day showed a one-half inch length inequality. Dr. Nelson concluded that Doughty needed a follow-up every three years.

During his three-year follow-up in November 2021, Doughty underwent hip and pelvis x-rays, which showed that the left hip prosthesis remained properly situated and intact.  Dr. Nelson also determined that:  there was no mechanical problem with the left hip prosthesis; and there was a leg length discrepancy of no more than one centimeter.  Finally, Dr. Nelson concluded that Doughty's right hip osteoarthritic warranted a total hip arthroplasty, noting that some joint space remained in his right hip as a result of naturally occurring degenerative changes to the hip.

In contrast, Doughty claims that he had never complained about right hip pain, but had told Dr. Nelson that he wanted to think about whether to undergo a right hip replacement surgery.  Regardless, on November 24, 2021, x-rays were taken of Doughty's right knee, which showed degenerative changes including narrowed joint spaces, on March 8, 2022, Doughty underwent an MRI of his right knee, which showed severe degenerative changes in the lateral joint compartment.  According to Dr. Grossman, such a change can result in a shortening of the *right* leg.  Next, on October 19, 2022, Doughty had an appointment at the University of Wisconsin-Madison Hospital, with Dr. Heiden, who Doughty claims told him that he only had one-half a centimeter of cartilage in his knee, but even if he lost all his cartilage, he would not notice a difference in leg length.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S.

7

317, 323 (1986). If there is a genuine issue as to a material fact, the court cannot grant summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

**I. Eighth Amendment**

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). First, a medical need is "serious" if it: so obviously requires treatment that even a lay person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). Second, "deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference requires *more than* negligence, or even gross negligence, but requires something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

8

The threshold for deliberate indifference is met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

Dr. Grossman argues that summary judgment is appropriate because he exercised medical judgment during the surgery, as well as afterward in his follow-up interaction with Doughty, and *no* evidence of record suggests that the surgery was performed incorrectly. Although Doughty disputes certain facts related to his interactions with Dr. Grossman, even his version of those disputes do not support a reasonable jury finding that Dr. Grossman's handling of his left hip replacement was so blatantly inappropriate that he failed to exercise medical judgment.

To start, there is no dispute that Doughty showed a leg length differential following the surgery. However, the largest measurement was a one-half inch differential. In Doughty's view, this difference is evidence that Dr. Grossman mishandled the hip replacement surgery, but for that to be true, there would need to be sufficient evidence for

9

a reasonable jury to find that a leg length differential is not a potential risk of that procedure absent deliberate indifference by the surgeon. The contrary is the case: in Dr. Grossman's professional opinion a leg length differential is a well-known risk of a total hip replacement, and Doughty has submitted no evidence contradicting Dr. Grossman's professional opinion that this well-known risk exists even if the operation is performed within the reasonable standard of care.

Alternatively, Doughty counters that Dr. Grossman failed to *tell* him about that risk, which Dr. Grossman disputes. Unfortunately for Doughty, however, this dispute is immaterial, at least under the Eighth Amendment. Specifically, Doughty's awareness of that risk is not relevant to whether Dr. Grossman performed the surgery itself with deliberate indifference; and Doughty is not proceeding on an informed consent claim under the Fourteenth Amendment. *See Knight v. Grossman*, 942 F.3d 336, 342 (7th Cir. 2019). Again, the central question for purposes of the Eighth Amendment claim in this lawsuit is whether a leg length differential is evidence that the surgery was performed without the exercise of medical judgment. On this record, in which there no dispute that a length differential is a well-known outcome of hip surgery, even when it is performed within the standard of care, his leg length differential does not support an inference of deliberate indifference.

Moreover, the records memorializing the procedure are undisputed and do not support a finding that Dr. Grossman mishandled the surgery. For example, Dr. Grossman's contemporaneous report notes no problems with placement of the hip prosthesis during the procedure, and he specifically noted that Doughty's knees and ankles appeared to

10

overlay one another, which meant to Dr. Grossman that Doughty's legs were "clinically equal." Doughty challenges this measurement as inexact, but he comes forward with *no* evidence that Dr. Grossman's assessment was wrong or that surgeons would compare leg lengths more precisely intraoperatively as a matter of standard medical practice.

Doughty also attests that he immediately noticed a difference in leg length, and he started wearing shoe inserts within a few weeks of his September 2017 surgery. Doughty further attests that he raised this issue with Dr. Grossman a month later during his follow-up appointment, and Dr. Grossman chose not to examine his gait because he was shackled during their 90-second meeting. If the court takes Doughty's version of this examination as true, however, that still does not permit a reasonable jury to find that Dr. Grossman mishandled the surgery nor that he later consciously disregarded a possible complication from the surgery.

To the contrary, no evidence beyond Doughty's unsupported assertions indicate that the left hip replacement was performed incorrectly or caused him problems falling outside the standard of care, much less that he acted with deliberate indifference to Doughty's medical need before, during or after surgery. Significantly, the series of x-rays of Doughty's hips taken between 2017 and 2021 universally revealed no indication of improper placement or loosening of the components of his artificial hip, including x-rays from Doughty's one-month follow-up with Dr. Grossman in October 2017, at which point Dr. Grossman noted no problems and saw no evidence of loosening components. Even in June of 2018, when Doughty's leg disparity was memorialized for the first time, x-rays were again taken, which continued to show no problems with the left hip prosthesis itself.

11

Furthermore, when Dr. Nelson met with Doughty in October of 2018, he also noted no problems with the left hip prosthesis after reviewing his x-rays. In fact, Dr. Nelson did not schedule Doughty for another appointment for three years; and even in November of 2021, Nelson saw no mechanical problems with the left hip components. In fairness, Dr. Nelson did note a leg length disparity five years out, as well as degenerative changes to Doughty's right hip, but Nelson did not comment or opine that those changes were attributable to the September 2017 surgery. In fact, nothing in the evidence presented at summary judgment would support a reasonable jury inferring that Dr. Grossman performed the surgery incorrectly, much less that consciously failed to take corrective action.

Dr. Grossman further opines that the leg length disparity could be attributable to plaintiff's right knee and hip conditions. Indeed, as of October 2018, Dr. Nelson had noted right hip joint space narrowing, and in 2021, his right hip had deteriorated to the point that Dr. Nelson recommended a replacement as well. Although Dr. Grossman's opinion is certainly not definitive proof of the actual cause of Doughty's leg length disparity, neither has he come forward with conflicting evidence, much less a contrary expert opinion, as to the cause of the leg length disparity, or again, that Doughty's leg length disparity -- which at most was formally measured at one-half of an inch -- was caused by a botched procedure.

Finally, Doughty cites three decisions in which a court found that issues of fact precluded summary judgment on a claim that a patient experienced a leg length differential following a total hip replacement. *See Young v. Faremouth*, No. 269730, 2007 WL 2141425

(Mich. Ct. App. 2007) (denying summary judgment to defendants on medical malpractice claims related to hip surgeries resulting in leg length differentials); *Eldridge v. McDonough*, No. 19-7990, 2021 WL 2170505 (Vet. App. 2021) (finding issues of fact related to whether patient gave informed consent in accordance with federal regulations); *Poyer v. United States*, No. 6:11-cv-3040-AA, 2013 WL 4786485 (D. Ore. Sept. 3, 2013) (dispute of fact as to the leg length discrepancy precluded summary judgment for defendant). However, each of these cases are distinguishable: *Young* and *Poyer* involved conflicting expert testimony of qualified experts, while Doughty has disclosed no contrary experts, nor submitted any other evidence to rebut Dr. Grossman's opinion that a leg length differential is a well-known outcome within the applicable standard of care; and even more importantly, these cases involve questions of *negligence*, not Eighth Amendment deliberate indifference. Therefore, these decisions are of no help to Doughty, even ignoring their lack of any controlling authority.

Given the lack of any admissible evidence that a reasonable trier of fact could find that Dr. Grossman failed to exercise medical judgment at any point during his treatment of Doughty's left hip replacement in 2017, the defendant is entitled to summary judgment on Doughty's Eighth Amendment claim against him.

II.  **Wisconsin negligence**

Defendant also asks that the court relinquish jurisdiction of plaintiff's supplemental state-law claim medical malpractice against Dr. Grossman, or alternatively conclude that his claim fails for lack of expert testimony establishing the appropriate standard of care.

13

The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial. 28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefson*, 807 F.3d 239, 252 (7th Cir. 2015); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 499-501 (7th Cir. 1999) ("[I]t is well established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

Under Wisconsin law, the elements of a claim for negligence are: (1) a duty of care or a voluntary assumption of a duty on the part of the defendant; (2) a breach of the duty, which involves a failure to exercise ordinary care in making a representation or in ascertaining the facts; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 307 (1987). In Wisconsin, expert testimony is necessary to establish the applicable standard of care *except* where a layperson could conclude, from common experience, that the plaintiff's injury would not have occurred if the provider had used proper care and skill. *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004).

Relying on common sense, Doughty maintains that expert testimony is unnecessary to establish the standard of care for an orthopedic surgeon performing hip replacement surgery. Given Dr. Grossman's opinions about the various risks associated with this procedure and other causes of leg length differential, a lay jury may not be permitted to intuit the proper standard of care, or whether a breach of that standard has occurred, based on the differential in leg length alone, at least without the input of expert testimony. Further, there is the factual dispute as to whether Dr. Grossman adequately apprised

Doughty of the risk of that outcome under Wisconsin law. Regardless, the outcome of these legal questions is not obvious. Therefore, the court will relinquish jurisdiction over Doughty's state law claim and dismiss it without prejudice. Subject to any applicable statute of limitations, *see* Wis. Stat. § 893.55, Doughty may pursue any remaining state-law medical malpractice claim in state court.

## ORDER

IT IS ORDERED that:

1. Defendant's motion for summary judgment (dkt. #43) is GRANTED.

2. The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 14th day of March, 2023.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge